IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**UNITED STATES OF AMERICA,**     CASE NO. 3:22 CR 588

   Plaintiff,

v.     JUDGE JAMES R. KNEPP II

**TONEY OSLEY,**

   Defendant.     MEMORANDUM OPINION AND ORDER

### INTRODUCTION

This matter comes before the Court on Defendant Toney Osley's Motion to Suppress all evidence obtained at an August 24, 2022, traffic stop. (Doc. 21). Osley argues law enforcement lacked probable cause to justify the stop. *Id.* This Court held an Evidentiary Hearing on January 30, 2023. Osley and the Government each filed a respective post-hearing brief on April 7, 2023. (Docs. 33, 34). Osley responded to the Government's brief. (Doc. 36).

For the reasons discussed below, Osley's Motion is denied.

### BACKGROUND

On August 24, 2022, the Toledo Bulk Cash Task Force ("Task Force") operated surveillance on Secor Road in Toledo's Westgate area. (Tr. 5)[1]. The Task Force is a narcotics interdiction unit comprised of members from the Department of Homeland Security, Lucas County Sheriff's Department, Toledo Police Department, and Wood Country Sheriff's Department. *Id.*

---

1. The Court held an Evidentiary Hearing in this matter on January 30, 2023. A transcript of that hearing is located at ECF Doc. 29.

Four or five Task Force members working on August 24, 2022, observed activity at the Red Roof Inn on Secor Road. *Id.* at 6. The Red Roof Inn is a known area of drug activity. *Id.* at 8. Brian Kennedy, a detective with the Lucas County Sheriff's Department and a member of the Task Force, was positioned at the Red Roof Inn and ran license plates of vehicles in the parking lot. *Id.* at 9, 83. Task Force members communicated through their radios. *Id.* at 9.

One of the vehicles in the Red Roof Inn's parking lot, a GMC Yukon, was registered to Osley. *Id.* Special Agent Andrew Watson of the United States Department of Homeland Security Investigations, a member of the Task Force, testified he was familiar with Osley due to his criminal history involving narcotics trafficking and weapons offenses. *Id.* The Task Force set up surveillance on Osley's vehicle. *Id.*

A Task Force member observed Osley as he exited room 319 of the Red Roof Inn carrying a black backpack. *Id.* at 10. Osley walked to his vehicle and got into the driver's seat; he then exited the vehicle, entered the rear driver's side passenger door, and reached over the third-row seat. *Id.* He then returned to the driver's seat, sat for a short period of time, and left the Red Roof Inn parking lot. *Id.*

Osley drove northbound on Secor and moved into the right turn lane to enter Interstate 475. *Id.* at 11. Agent Watson testified he observed Osley approach a red light at the intersection of Secor Road and I-475. *Id.* Osley slowed his vehicle, but did not come to a complete stop, and turned right onto the I-475 eastbound entrance ramp. *Id.* Agent Watson radioed the traffic violation to the Toledo Police unit assigned to the Task Force and asked for Osley to be pulled over. *Id.* at 12.

Officer Michael Garcia was the uniformed Toledo Police unit assigned to the Task Force. *Id.* at 33. He was accompanied by Zola, a drug detection dog. *Id.* at 35. Officer Garcia was positioned in a shopping center south of the Red Roof Inn in a marked vehicle. *Id.* at 37. Officer

Garcia heard over the radio that Osley committed a traffic violation and was northbound on Secor Road. *Id.* at 38-39. Officer Garcia did not witness this traffic violation. *Id.* at 38.

Officer Garcia followed Osley onto I-475. *Id.* at 39-40. He first encountered Osley on I-75 North after the 475/75 interchange. *Id.* at 41. There are four lanes of traffic on the portion of roadway where Officer Garcia encountered Osley. *Id.* As Officer Garcia pulled behind Osley, Osley changed lanes to the right without use of a turn signal. *Id.* Osley then turned on his signal and made two abrupt-continuous lane changes to the right to get off at the Phillips exit. *Id.* Osley straddled the fog line for the exit while still on I-75. *Id.*

Osley then committed to the Phillips exit. *Id.* at 44. After he observed the above-mentioned traffic violations, Officer Garcia activated his overhead lights and initiated a traffic stop. *Id.* Osley did not stop on the shoulder of the exit. *Id.* at 47. Instead, he continued down the exit ramp to the Phillips traffic light, turned right onto Phillips, and then pulled over. *Id.* Officer Garcia opined that Osley's behavior was indicative of police evasion. *Id.* at 48. Officer Garcia observed Osley reach his right arm towards the back seat where he kept it until the bottom of the exit ramp. *Id.* at 49.

After Osley pulled over, Officer Garcia approached the vehicle. *Id.* There is body camera ("body cam") footage capturing the encounter. *Id.*; *see* Evidentiary Hearing Gov't Ex. 4. Officer Garcia smelled marijuana coming from the vehicle. (Tr. 49). He asked Osley, "How much weed do you have?" *Id.* Osley responded "a little bit." *Id.* at 50. Officer Garcia placed Osley in handcuffs for officer safety and drug investigation. *Id.* A marijuana "roach" was in the console. *Id* at 67. Osley told Officer Garcia he had a medical marijuana card. *Id.* at 50-51. Osley then admitted he smoked a joint at the Red Roof Inn. *Id.* at 51. At this point, although Osley was in handcuffs, he was told he was not under arrest. *Id.* at 51.

3

Officer Garcia looked for Osley's medical marijuana card in the vehicle. *Id.* at 52; *see also* Garcia Body Cam at 4:00-5:45. Officer Garcia discovered a bag of marijuana inside of a bookbag in the vehicle. (Tr. 52-53). There was also a black plastic bag containing cash. *Id.* at 53. The money was rubber banded together. *Id.* Another Task Force member assisting in the investigation informed Officer Garcia that a firearm and additional marijuana were found in the vehicle's third row. *Id.* at 54, 89.

Officer Garcia wrote Osley a ticket for turn signal and marked lane violations. *Id.* at 55. Officer Garcia personally observed these violations. *Id.* at 56. Osley was arrested and his vehicle was towed. *Id.*

Officer Garcia's was the only vehicle in the Task Force equipped with a dashboard camera ("dash cam"). *Id.* at 24. Officer Garcia's dash cam is designed to automatically begin recording 30 seconds prior to when the overhead lights of the vehicle are activated. *Id.* at 70. When Officer Garcia activated his overhead lights to pull over Osley, the dash cam malfunctioned. *Id.* at 46. The dash cam turned on and recorded audio, but the video only shows a white screen. *Id.* Officer Garcia testified this was the first time such a malfunction occurred. *Id.* at 70. Officer Garcia learned of the malfunction a few days later when federal law enforcement attempted to view the footage. *Id.* at 75. A technology team told Officer Garcia a wire in the cruiser had failed. *Id.* at 76.

## DISCUSSION

Osley argues law enforcement lacked probable cause to justify the traffic stop that preceded the search of his vehicle. *See* Doc. 21. He argues Officer Garcia's credibility regarding the traffic violations is called into question due to pretextual motivation, the dash cam footage malfunction, and perceived inconsistencies between Officer Garcia's testimony and the body cam footage. (Doc. 36, at 1, 3-4). For the following reasons, this Court finds Officer Garcia's testimony

4

regarding Osley's traffic violations credible and that law enforcement had probable cause to initiate a traffic stop.

The Fourth Amendment guards against unreasonable seizures. *Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 528 (1967). "An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth [and Fourteenth] Amendment[s]." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008). "A police officer legally may stop a car when he has probable cause to believe that a civil traffic violation has occurred. Probable cause is a reasonable ground for belief supported by less than prima facie proof but more than mere suspicion." *Id*. (internal citations omitted). Furthermore, "[w]hen a traffic stop is supported by probable cause, an officer's subjective intent is irrelevant." *Id.* Indeed, "police officers may stop vehicles for any infraction, no matter how slight, even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop." *Id.* (internal citations omitted).

"The fact that a traffic violation is not an arrestable offense does not divest the police of authority to stop the vehicle to issue a citation or conduct an investigation." *United States v. Bohannon*, 2023 U.S. Dist. LEXIS 70407, *7 (N.D. Ohio) (citing *United States v. Anderson*, 458 F. App'x 440, 443 (6th Cir. 2012) (license plate violation provided probable cause to make a traffic stop)). "The existence of probable cause is determined by the totality of the circumstances. In making credibility determinations as to an officer's purported reason for initially stopping a vehicle, the Court may use the record in the case before it, what has been learned from other similar cases, all reasonable inferences drawn therefrom, as well as its own common sense." *United States v. Whiteside*, 22 F. App'x 453, 459 (6th Cir. 2001) (internal citations omitted); *see also United States v. Blakemore*, 2017 U.S. Dist. LEXIS 36152, *11 (E.D. Tenn.) ("A court is given wide latitude in making its credibility determinations. In assessing credibility, a court considers

5

numerous factors, ultimately relying on the common sense tests of reason and logic.") (internal citation omitted).

Probable Cause

Officer Garcia testified he personally witnessed Osley commit a turn signal violation and marked lane violations; he issued Osley a citation for those traffic infractions. (Tr. 41, 55-56). As stated above, "police officers may stop vehicles for any infraction, no matter how slight" so long as the traffic stop is supported by probable cause. *See Blair,* 524 F.3d at 748. Therefore, "the suppression issue comes down to whether it is credible that [Officer Garcia] observed [the] violation[s] as he claims." *Blakemore*, 2017 U.S. Dist. LEXIS 36152 at *11.

*Credibility Determination*

The Court finds Officer Garcia's observations to be credible. Osley's assertion that the Task Force was determined to pull him over, (Doc. 33, at 3) ("And they set out to stop his vehicle."), after he was observed at the Red Roof Inn is not suggestive of lack of credibility. At most, it shows the traffic stop was pretexted on suspected narcotics trafficking activity, which is permissible under the Fourth and Fourteenth Amendments. *See Blair*, 524 F.3d at 748.

Osley argues the malfunction in the dash cam recording weighs against Officer Garcia's credibility. (Doc. 33, at 3-4). The Court disagrees. Officer Garcia testified his dash cam appeared to function at the time he activated the overhead lights. (Tr. 46, 75). And it did record audio. *Id.* at 46. Further, Officer Garcia's body cam was activated near the same time and the recording was preserved. *Id.* at 47. Officer Garcia did not discover there was an issue with the video recording until a few days later and testified technical services told him a "bad wire" caused the video malfunction *Id.* at 75-76. The Court finds the dash cam video malfunction is not indicative of deception. Recording audio, activating his body cam, and consulting technical services to repair

6

the dash cam are inconsistent with a finding that Officer Garcia, either with intent or acquiescence, sought to make the video recording malfunction.

Osley next argues Officer Garcia misstated facts in his testimony that draw his credibility into question. (Doc. 36, at 4). Osley contends Officer Garcia's testimony that he witnessed Osley reach into the second-row seat while he continued down the Phillips exit is inconsistent with the physical evidence found in the back seat of the vehicle. *Id.* at 3. Osley supports this argument with Officer Garcia's testimony that nothing of interest was in the second row. (Tr. 73). However, the Court finds that nothing "of interest" was found directly behind the driver's seat does not suggest Osley was not viewed reaching into the backseat.

Osley further argues Officer Garcia's testimony as to the location of the backpack is contradicted by the body cam footage. (Doc. 36, at 3). He contends the body cam footage shows the backpack was in the third row but Officer Garcia testified it was in the second. *Id.* This Court finds any trivial inconsistency insufficient to undermine the credibility of Officer Garcia's observations regarding Osley's traffic violations.

Accordingly, the Court finds Officer Garcia's testimony regarding Osley's traffic violations credible and that law enforcement had probable cause to initiate a traffic stop. Osley's Motion to Suppress (Doc. 21) is therefore denied.

## CONCLUSION

For the foregoing reasons, good cause appearing, it is

ORDERED that Defendant Osley's Motion to Suppress (Doc. 21) be, and the same hereby is, DENIED.

                                           s/ *James R. Knepp II*
                                           UNITED STATES DISTRICT JUDGE