**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA,**                    CASE NO. 3:22 CR 588

      Plaintiff,

      v.                                                        JUDGE JAMES R. KNEPP II

**TONEY OSLEY,**

      Defendant.                                        **ORDER**


Currently pending before the Court in this criminal case are two pretrial motions filed by *pro se* Defendant Toney Osley. *See* Docs. 80, 82. Both are fully briefed and decisional. For the reasons discussed below, the Court denies both motions.

Motion to Sever (Doc. 80)

*Background*

Osley was originally charged in an October 5, 2022, three-count indictment with: (1) Possession with Intent to Distribute Marijuana (Count One); (2) Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Count Two); and (3) Felon in Possession of a Firearm (Count Three). (Doc. 1). These charges were based on Osley's alleged actions on August 24, 2022. *See id.* On June 28, 2023, Osley was charged in a seven-count Superseding Indictment. (Doc. 49). Counts Three, Five, and Seven of the Superseding Indictment mirror Counts One through Three of the original indictment. *Compare* Doc. 1 *with* Doc. 49. The Superseding Indictment added four additional charges: Possession with Intent to Distribute a Controlled Substance (Count One); Possession with Intent to Distribute a Controlled Substance (Count Two); Possession of a Firearm in Furtherance of a Drug Trafficking Crime (Count Four); and Felon in Possession of a Firearm

(Count Six). *See* Doc. 49. These new charges were based on Osley's alleged actions on August 19, 2022. *See id.*

*Discussion*

Osley moves to sever the charges alleged in the original indictment from those added by the superseding indictment. (Doc. 80). He alleges the added charges are not sufficiently related as the initial indictment's charges involved an unloaded derringer pistol and possession/distribution of marijuana whereas additional charges in the superseding indictment involve cocaine and a semi-automatic pistol. Specifically, Defendant seeks to sever Counts 1, 2, 4, and 6 from Counts 3, 5, and 7. He contends "there is no nexus between the two separate events" and trying the charges together would violate Rule 8(a). (Doc. 80, at 6). The Government responds that the offenses "were nothing if not closely and logically intertwined, and the separation in time was minimal." (Doc. 89, at 6). It further argues that severance would serve no purpose because "the events underlying the counts for each day, if severed, would almost certainly be admissible evidence at each other respective trial." *Id.* at 7.

**Rule 8 Joinder**

Federal Criminal Rule 8 provides that an indictment "may charge a defendant in separate counts with 2 or more offenses if the offenses charged . . . are of the same or similar character, or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). "Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment." *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002). If joinder of multiple offenses does not comply with Rule 8, "the district court has no discretion on the question of severance." *Id.*

Unsurprisingly, Osley focuses on the distinctions between the charges, while the Government emphasizes their similarities. *See* Doc. 80, at 4 ("The Superseding Indictment contains two separate and distinct allegations: (1) that the Defendant possessed marijuana and a firearm on August 24, 2022 while driving a vehicle, and (2) that the Defendant possessed cocaine and a firearm on August 19, 2022 in a residence."); Doc. 89, at 6-7 ("On one day, Defendant was found in possession of, among other items, bulk cocaine packaged for sale, a large amount of marijuana, a firearm, and tens of thousands of dollars in cash. Five days later, Defendant was found in possession of bulk marijuana packaged for sale, a firearm, and thousands of dollars in cash.").

The Court finds Osley's attempt to distinguish the charges based on the type of drug or type of firearm unpersuasive.

In *United States v. Wilkins*, the defendant was charged with five offenses, three of which occurred on January 1, 2003. 253 F. App'x 538, 539 (6th Cir. 2007). Those offenses included charges of being a felon in possession of a firearm (Count 1), possessing a firearm in furtherance of a drug trafficking crime (Count 2), and possessing marijuana with intent to distribute (Count three). *Id.* The indictment included two additional offenses that took place three months later, on April 3, 2003, and charged the defendant with being a felon in possession of a firearm (Count 4) and being a felon in possession of six rounds of ammunition (count 5). *Id.* The defendant moved to sever counts one through three from counts four and five. *Id.* The Sixth Circuit concluded joinder of all counts was proper. *Id.* at 541. Although no language in the indictment suggested that counts one through three were part of the same transaction or connected with counts four and five, which took place three months later, the Sixth Circuit concluded that counts one, four, and five were offenses "of the same or similar character," thus rendering joinder proper under Rule 8(a). *Id.* (quoting Fed. R. Crim. P. 8(a)). This was so because "[b]oth Count 1 and Count 4 charged the

defendant with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g), and Count 5 charged the defendant with being a felon in possession of six rounds of ammunition in violation of 18 U.S.C. § 922(g)." *Id.* In other words, counts one, four, and five were "of the same or similar character" given that each charged the defendant with violations of the same statute, 18 U.S.C. § 922(g). The Sixth Circuit also concluded that "Counts 2 and 3 were a part of the same act or transaction as Count 1, [having all occurred on January 1, 2003], and thus those counts were also properly joined in the same indictment with Counts 1, 4 and 5." *Id.*

Moreover, courts have found that a difference in the type of drug underlying the charge is immaterial for purposes of the joinder inquiry. The Seventh Circuit rejected a defendant's argument that joinder of marijuana and cocaine trafficking charges was improper because they involved different drugs and occurred at different times. *United States v. Berg*, 714 F.3d 490, 495 (7th Cir. 2013). The court emphasized that for offenses to be "of the same or similar character," Rule 8(a) only requires that they be "of like class" and does not demand that they be related temporally or evidentially. *Id.* (citations omitted). Applying that standard, the Seventh Circuit found it inconsequential that the defendant's charges involved trafficking of different kinds of drugs (marijuana and cocaine). *Id.* Instead, the court concluded, "the fact that both crimes involved drug dealing suffices to make them of like class." *Id.*

Here, on the face of the Superseding Indictment, Osley is charged with three counts of possession with intent to distribute a controlled substance in violation of 21 U.S.C. § 841(a)(1) (Count 1 – August 19, 2022; cocaine); (Count 2 – August 19, 2022; marijuana); (Count 3 – August 24, 2022; marijuana), and two counts of possession of a firearm in furtherance of a drug trafficking crime in violation of 18 U.S.C. § 924(c)(1)(A)(i) (Count 4 – August 19, 2022); Count 5 (Count 5 – August 24, 2022); and two counts of felon in possession of a firearm (Count 6 – August 19,

2022); (Count 7 – August 24, 2022). These charges "are of the same or similar character". Fed. R. Crim. P. 8(b); *Wilkins*, 253 F. App'x at 541; *Berg*, 714 F.3d at 495. Therefore, the Court finds the charges are properly joined under Rule 8.

### Rule 14 Severance

Osley also alleges that even if Rule 8 permits joinder, severance is proper under Federal Criminal Rule 14 because joinder will be prejudicial. (Doc. 80, at 7-8).

"Rule 14 authorizes a defendant to move for severance in situations in which joinder of multiple offenses or defendants is proper under Rule 8, but nonetheless would be prejudicial to the defendant." *Chavis*, 296 F.3d at 457 (citing *Zafiro v. United States*, 506 U.S. 534, 538 (1993)). To prevail on a Rule 14 motion to sever, the defendant "must show compelling and specific prejudice" that would result from a single trial. *United States v. Sherlin*, 67 F.3d 1208, 1215 (6th Cir. 1995) (citing *United States v. Sivils*, 960 F.2d 587, 594 (6th Cir. 1992)). Such prejudice exists in cases where "the jury would be unable to keep the evidence from each offense separate and unable to render a fair and impartial verdict on each offense." *United States v. Rox*, 692 F.2d 453, 454 (6th Cir. 1982) (citation omitted). Nevertheless, the Sixth Circuit follows a presumption that juries can sort through the evidence and consider each count separately. *United States v. Carver*, 470 F.3d 220, 238 (6th Cir. 2006) ("the risk of prejudice to defendants in a joint trial is presumably low, because 'juries are presumed capable of sorting evidence and considering separately each count and each defendant.') (quoting *United States v. Welch*, 97 F.3d 142, 147 (6th Cir. 1996)). And dangers of prejudice are often curable by measures less drastic than severance, such as limiting instructions. *United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002) (citing *United States v. Jacobs*, 244 F.3d 503, 507 (6th Cir. 2001)).

Osley again focuses on the distinctions between the type of firearm involved, the type of drugs at issue, and the differences between how both were discovered (a traffic stop versus a search pursuant to warrant). He asserts that "combining both disjointed sets of allegations would be unfairly prejudicial and unnecessary." (Doc. 80, at 7-8). The Court finds Osley has not identified specific prejudice from the joinder of the offenses, nor anything to suggest a jury would be unable to consider each count independently. The Court denies Osley's motion to sever.

Motion to Suppress (Doc. 82)

Osley also moves to suppress all evidence obtained from the August 19, 2022, search of a residential address on Western Avenue in Toledo. (Doc. 82).

*Background*

The following facts are taken from DEA Task Force Officer Donald R. Widmer's Affidavit in Support of Search Warrant (Doc. 89-1) and Report of Investigation (Doc. 89-2).

Starting in 2018, the DEA identified an individual who had bulk drug proceeds he wanted to ship to Mexico. (Doc 89-1, at ¶ 11).

In June 2022, this individual and another had conversations regarding the pick-up of bulk cash in Toledo. *Id.* at ¶ 13. A few days later, the first individual delivered $190,200 in cash (suspected drug proceeds). *Id.* at ¶ 15.

On August 15, 2022, a similar delivery occurred. *Id.* at ¶ 20-22. This time, $199,985 in suspected drug proceeds was delivered. *Id.* at ¶ 22. The individual who delivered the money said "he was involved in the sale of 'white' and 'brown'", which TFO Widmer asserts his training and experience tells him "is slang for cocaine and heroin respectively. *Id.* at ¶ 23. The individual also provided a price for a kilo of cocaine. *Id.*

6

On August 19, 2022, officers were conducting surveillance when they observed the same individual involved in the bulk cash transactions park in the back alley an address on Western Avenue in Toledo ("the residence"), a residence owned by Osley through an LLC. *Id.* at ¶ 25. Agents had, on multiple occasions over the prior months, observed the same individual park in the back alley and walk toward a back door of the residence. (Doc. 89-1, at ¶ 26).

Officers observed the individual park in the back alley and meet Osley on the front porch of the residence; the two men spoke for about an hour and the individual departed. *Id.* Officers followed the individual to another location (which the Government asserts was affiliated with the individual's previous bulk cash transactions), where they observed him enter and shortly thereafter exit carrying an object that appeared heavy, which he placed in the rear driver's side door of his truck. *Id.* The individual then returned to the back alley behind the residence and removed a red and blue duffel bag that appeared heavy from the rear driver's side door. *Id.* Osley took the duffel bag inside and the other individual departed. *Id.*

Approximately one hour later, Osley departed the residence carrying what appeared to be a cereal box in a yellow Dollar General shopping bag. *Id.* at ¶ 27. He drove to an apartment complex known to law enforcement to have a history of narcotics enforcement actions. *Id.* Osley entered the apartment building, and exited with the cereal box and bag approximately an hour later. *Id.* He ran errands and then returned to the residence, taking the bag back into the residence around 3:45 p.m. *Id.*

TFO Widmer asserted that based on his training and experience, probable cause existed to believe the other individual delivered narcotics to Osley, who then delivered a subset of those narcotics "in the cereal box he unusually took into an apartment and returned to [the residence] with". *Id.* at ¶ 28. He further asserted probable cause existed to believe a larger amount of narcotics

remained at the residence due to the difference in size between the duffel bag and the cereal box. *Id.* TFO Widmer further stated that the residence "has two front doors" and that it "appears to have been a duplex at one point, but currently has one address." *Id.* The description of the property to be searched stated the residence had "a covered front porch and two white front screen doors." (Doc. 89-1, at 3). It stated that the same address numbers were "on two mail boxes attached to the front of the residence" and "[a]lthough the building has two doors, it has a single address." *Id.* The warrant sought specific evidence related to violations of 21 U.S.C. § 846 (drug conspiracy) and 18 U.S.C. § 1956 (money laundering). (Doc. 89-1, at 1, 15-16).

Magistrate Judge Darrell A. Clay issued the search warrant on August 19, 2022. (Doc. 89-1, at 1).

In his Report of Investigation, TFO Widmer detailed that the search warrant was executed at approximately 8:55 p.m. that same day. (Doc. 89-2, at 1). Officers knocked and announced, and then forced entry. *Id.* They found and detained an adult male, adult female, and male juvenile, and secured the first floor of the residence. *Id.*

Officers entered the second floor of the residence "through a second front door"; the second floor was unoccupied. *Id.* at 2. Keenan Hopings arrived in a vehicle in the back alley and stated he resided on the second floor of the residence; Hopings was detained. *Id.*

Officers did not find anything illegal on the first floor. *Id.* at 3. The adult female stated that Osley owned and has access to the residence. *Id.* The adult male stated that he, Osley, and Hopings are brothers. *Id.* Officers found the following in their search of the second floor:

1. A Ruger PC Charger 9mm AR pistol with one loaded 9mm magazine and two unloaded 9mm magazines (in a box in the attic);

2. A yellow plastic bag containing seven individually packaged plastic bags containing cocaine (in the attic);

3.  A rectangular shaped package containing cocaine (in the attic);

4.  A yellow plastic bag containing a brown paper bag and a cereal box that contained $38,460.00 in cash (in the attic);

5.  A mason jar containing marijuana (in Hopings' bedroom dresser drawer);

6.  A blue/red/white duffel bag (in the family room);

7.  Two plastic bags containing marijuana (one in the spare bedroom closet and one under Hopings' bed);

8.  A plastic bag containing three individually packaged plastic bags containing cocaine;

9.  An electronic digital scale and a box of baking soda.

*Id.* at 2-3.

Hopings denied ownership of the cocaine and stated it could only belong to one other person. *Id.* at 3. He "nodded indicating yes" when asked if Osley was the owner of the residence and the only other person with a key to the second floor. *Id.* He further stated that when he departed the residence earlier in the day, Osley and his two children were inside the residence on the second floor. *Id.* Hopings also said he knew nothing about a firearm. *Id.*

*Discussion*

Osley raises two challenges – first, he argues the warrant was not supported by probable cause, and second, he argues the warrant was overbroad. The Government disagrees. For the reasons set forth below, the Court denies Osley's challenges.

**Probable Cause**

The Fourth Amendment to the United States Constitution provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. To establish probable cause, officers must establish "a fair probability that contraband or evidence of a crime

9

will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Put another way, there must be a "nexus" between the "place" to be searched and the "things" to be seized. *United States v. Reed*, 993 F.3d 441, 447 (6th Cir. 2021). "Probable cause is defined as 'reasonable grounds for belief, supported by less than *prima facie* proof but more than mere suspicion.'" *United States v. King*, 227 F.3d 732, 739 (6th Cir. 2000) (quoting *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990))

Whether the affidavit gives rise to this fair probability "depends on the totality of the circumstances." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Gates*, 462 U.S. at 230). "The probable cause standard is a 'practical, non-technical conception' that deals with the 'factual and practical considerations of everyday life.'" *Id.* (quoting *Gates*, 462 U.S. at 231); *see also Gates*, 462 U.S. at 231 (highlighting the "common-sense conclusions about human behavior" that are integral to an analysis of probable cause); *Florida v. Harris*, 568 U.S. 237, 244 (2013) (describing a "practical and common-sensical standard" underlying the analysis of probable cause).

In assessing the sufficiency of an affidavit supporting a warrant, the Court looks only to the four corners of the affidavit. *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010). To encourage use of the warrant procedure, a magistrate judge's probable-cause determination is afforded "great deference" and should be reversed only if the issuing judge arbitrarily exercised his discretion. *Gates*, 462 U.S. at 236 (quotation omitted); *see also United States v. Baker*, 976 F.3d 636, 646 (6th Cir. 2020) (recognizing courts' obligation to give issuing judges the benefit of the doubt in "doubtful or marginal cases"); *United States v. Brown*, 732 F.3d 569, 573 (6th Cir. 2013) ("[W]e may only reverse a magistrate's decision to grant a search warrant if the magistrate arbitrarily exercised his or her authority."); *United States v. Lapsins*, 570 F.3d 758, 763 (6th Cir.

10

2009) ("[S]o long as the magistrate had a substantial basis for . . . concluding that a search would uncover evidence of wrongdoing, the Fourth Amendment requires no more.").

Here, the Court has no trouble concluding that the totality of the circumstances detailed in the warrant application provided sufficient probable cause. Although Osley argues that "the investigating officers did not witness Mr. Osley in possession of any actual drugs or cash during their surveillance" (Doc. 95, at 4) and that "officers had not witnessed a single instance of narcotics sales, did not have recorded phone conversations or texts related to illegal activity, did not have a single witness claiming that Mr. Osley was a known drug dealer, and had not seen the alleged supplier with any actual cocaine" (Doc. 95, at 5), this is not the standard. Probable cause means "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Officers were armed with information that the individual who Osley interacted with had previously delivered large amounts of cash (suspected drug proceeds), that individual went to the location affiliated with those previous cash transactions, and that individual brought a large duffel bag to Osley at the residence. Shortly after this, Osley left the residence with a cereal box in a bag, went to an apartment complex with a history of narcotics investigations, and left the apartment building a short time later, with the cereal box and bag still with him. He ultimately returned to the residence with the cereal box and the bag. These facts, taken together, with even a modicum of common sense applied, suffice to establish probable cause. Although Osley argues "[t]he events that TFO Widmer described mostly resembled an ordinary day in the life of any average American citizen", the Court agrees with the Government's (and TFO Widmer's) analysis that common sense observations about human behavior suggest it is unusual for an individual to take a cereal box from a residence to a second location, and then return to a residence with the same cereal box. This common-sense observation (as well as TFO Widmer's training and

experience), combined with the other facts, sufficed to establish probable cause. And certainly, the Magistrate Judge did not arbitrarily exercise his discretion in so finding.

*United States v. Brown*, 828 F.3d 375 (6th Cir. 2016), upon which Osley relies, does not dictate a contrary conclusion. Osley quotes from *Brown*: "If the affidavit fails to include facts that directly connect the residence with the suspected drug dealing activity . . . it cannot be inferred that drugs will be found in the defendant's home – even if the defendant is a drug dealer." 828 F.3d at 384. Here, the affidavit included precisely those facts connecting the residence with the suspected drug dealing activity – the delivery of the duffel bag, followed by Osley's departure from the residence with a smaller container, and Osley's later return with that smaller container. As TFO Widmer stated, "probable cause exists to believe a larger amount of narcotics still remains at [XXX] Western Avenue because the contents of the . . . duffel bag appeared much larger than what could be placed in the cereal box." (Doc. 89-1, at ¶ 28).

For the foregoing reasons, Osley's motion to suppress is denied to the extent it challenges whether the warrant was supported by probable cause.

### Overbreadth

Osley next asserts the execution of the warrant was overbroad. He contends officers knew or should have known the home was made up of two separate units and that this was "patently obvious the very moment officers gained entrance into the downstairs apartment." (Doc. 82, at 6). Osley points to the fact that the house had two front doors, and asserts it also had two electric meters, attaching two Toledo Edison bills. (Doc. 82-3).[1] He contends the execution of the warrant violated the Fourth Amendment because the search warrant authorized entry into a single-family

---

1. The first bill is from October 4, 2022. (Doc. 82-3, at 1). It is addressed to Keenan L. Hopings at "[XXX] Western Ave UPPR". *Id.* The second bill is from September 5, 2023. *Id.* at 3. It is addressed to Michael Silvera at "[XXX] Western Ave LOWR." *Id.*

dwelling, but officers "entered and searched two separate residences of a duplex." (Doc. 82, at 7). The Government responds that the search warrant accurately described Osley's ownership and control of the entire house and asserts the search was not overly broad. (Doc. 89, at 11). It further contends that even if the warrant were overbroad, the proper relief would be suppression only of the evidence in the area of the house for which there was arguably not probable cause (which, in retrospect, is the first floor). *Id.* at 13. Finally, in the alternative, the Government argues the officers executed the search warrant in good faith. *Id.* at 14.

The Fourth Amendment demands that warrants "particularly describ[e] the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Particularity is required to prevent "general order[s] to explore and rummage" and avoid "the danger of unlimited discretion in the executing officer's determination of what is subject to seizure." *United States v. Greene*, 250 F.3d 471, 476-77 (6th Cir. 2001) (citations omitted). To determine whether a warrant describes with sufficient particularity the place to be searched, courts must consider "(1) whether the place to be searched is described with sufficient particularity as to enable the executing officers to locate and identify the premises with reasonable effort; and (2) whether there is reasonable probability that some other premises may be mistakenly searched." *Knott v. Sullivan*, 418 F.3d 561, 568 (6th Cir.2005) (quoting *United States v. Gahagan*, 865 F.2d 1490, 1497 (6th Cir.1989)).

As Osley correctly identifies, "[a] warrant describing an entire building when cause is shown for searching only one apartment is void", *United States v. Votteller*, 544 F.2d 1355, 1363 (6th Cir. 1973), and "when a structure under suspicion is divided into more than one occupancy unit, probable cause must exist for each unit to be searched", *United States v. Shamaeizdah*, 80 F.3d 1131, 1137 (6th Cir. 1996) (internal quotation omitted). When a warrant is obtained for an entire structure, it is invalid if law enforcement "had known, or should have known," that the

13

location was divided into separate units. *Maryland v. Garrison*, 480 U.S. 79, 85–86 (1987). Furthermore, law enforcement officers are "required to discontinue [a] search . . . as soon as they discover[ ]" that a location is in fact subdivided into separate dwelling units if it "put[s] [them]on notice of the risk that they might be in a unit erroneously included within the terms of the warrant, especially if it is unclear which unit belongs to the subject of the warrant. *Id.* at 87. The validity of such a search "depends on whether the officers' failure to realize the overbreadth of the warrant was objectively understandable and reasonable." *Id.* at 88.

Nevertheless, courts have upheld searches in buildings containing multiple units based on the specific facts at play. *See, e.g.*, *United States v. Crumpton*, 824 F.3d 593, 615 (6th Cir. 2016) ("The lack of indicia that the house included any separate living areas, along with the suggestion that Crumpton used the front and back areas of the house, renders the government's belief that the house was a single residence reasonable."); *United States v. Gonzalez*, 697 F.2d 155, 156 (6th Cir. 1983) (upholding as supported by probable cause search of multi-unit dwelling where the affidavit detailed individuals having "control of the whole building as if it were a single unit").

Further, where probable cause supported search of the entire building, the Sixth Circuit has found that "discovering upon execution that a 'two story single family home," as specified in the warrant affidavit, contained two living units did not disturb the police's probable cause to search the entire property." *United States v. Woodbury*, 485 F. App'x 58, 60 (6th Cir. 2012) ("The determinative issue is not whether the police could have handled the search differently  upon discovery of  the division of the house. We decide only whether the warrant was constitutionally valid and its execution constitutionally reasonable under the circumstances."). And, where an overbroad warrant is executed, the remedy is only partial suppression – suppression of evidence found in the area of the building which should not have been searched. *See Shamaeizadeh*, 80 F.3d

at 1139 (where officers knew before executing a warrant that house contained separate residences, search of basement apartment violated Fourth Amendment, and suppression of the evidence found in basement apartment appropriate).

In *Woodbury*, the affidavit in support of a search warrant for a residence stemmed from the conduct of Woodbury's co-defendant. 485 F. App'x at 60. On two occasions in a six day period, a detective performed undercover controlled drug buys from the co-defendant; each time, the detective observed the co-defendant enter the residence through the front door, and walk out "carrying a plastic sandwich bag containing 'an off white chunky substance' that tests showed to be cocaine", and sold the cocaine to the detective. *Id.* "Plainly", the Sixth Circuit explained, "these observations supplied police with probable cause to believe that the . . . residence contained contraband." *Id.* Addressing Woodbury's argument that "police should have stopped the search and obtained a more specific warrant once they discovered that the . . . residence contained two living units", the Sixth Circuit explained:

> Woodbury is incorrect. The officers' observations of Boyd provided them with probable cause to believe that he obtained the cocaine from inside the house. That probable cause did not dissipate once police realized that the interior of the house, which their investigation indicated was a single-family residence, contained two living units. The critical fact remained: Boyd apparently obtained illegal drugs from a residence owned and occupied by a third party located inside the front door of "XXX South Jackson Street." The warrant properly extended to separate structures within the curtilage of the residence, and the police did not err in relying on the warrant to conduct a search of the subunits within the residence itself.

*Id.* The Sixth Circuit therefore held that "the warrant was not even overbroad, because probable cause extended to the entirety of the South Jackson Street property . . . . The officers' decision to continue their search despite the internal subdivision of the residence into two units was, as in *Garrison*, 'objectively understandable and reasonable.'" *Id.*

15

The Court finds on the facts before it, the warrant was not overbroad. Here, law enforcement officers fully disclosed that the residence had two front doors and appeared to at some point to have been a duplex, but at the time of the search reflected a single address. They noted that Osley owned the entire house through an LLC. Further, there was no allegation or indicia that Osley resided at the house, nor any suggestion that he occupied or had access to only a discrete part of the residence.[2] Moreover, the activity related to the other individual revealed by the officers' surveillance was tied, at least in part, to the back alley behind the house, not just the front. The entire house belonged to the individual with whom probable cause to search was associated. This distinguishes this case for one where a search warrant is obtained for a dwelling based in part on the fact that the suspect resided there, or had access to only a portion of the dwelling. *Cf. Garrison*, 480 U.S. at 87. Thus, the Court finds that the warrant supplied probable cause for the entirety of the house. This case is more like *Woodbury*, where the discovery on entry that the residence contained more than one dwelling unit did not negate or undermine the warrant's provided probable cause for the search of the entire property. Further, as in *Woodbury*, the officers' decision in the instant case to continue their search despite the internal subdivision of the residence into two units was, as in *Garrison*, "objectively understandable and reasonable." *Woodbury*, 485 F. App'x at 60.

The Court denies Osley's motion to suppress based on an allegation that the warrant was overbroad.

For the foregoing reasons, good cause appearing, it is

---

2. Indeed, at  the time of the search both the upstairs and downstairs residents told law enforcement officers that Osley had access. (Doc. 89-2, at 3).

16

ORDERED that Osley's Motion to Sever (Doc. 80) be, and the same hereby is, DENIED; and it is

FURTHER ORDERED that Osley's Motion to Suppress (Doc. 82) be, and the same hereby is, DENIED.

 s/ *James R. Knepp II*
UNITED STATES DISTRICT JUDGE